1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN GEARHART,<br><br>                    Plaintiff,<br><br>     v.<br><br>UNITED STATES OF AMERICA,<br><br><br>                    Defendant. | Case No.: 15cv665-MDD<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

The above matter came on for trial beginning on May 9, 2016 in Courtroom 1E of the Edward J. Schwartz Courthouse, the Honorable Mitchell D. Dembin, United States Magistrate Judge, presiding.  (ECF Nos. 21-23). The parties previously consented to jurisdiction by a United States Magistrate Judge and the case was referred by order of the Honorable Marilyn L. Huff, United States District Judge.  (ECF No. 11).

1

1    The Plaintiff, Brian Gearhart, was present and was represented by
2  attorney Steven I. Kastner.  The Defendant, the United States of America,
3  was represented by Assistant United States Attorney Steven J. Poliakoff.
4  Parties and witnesses testified under oath and evidence was presented.
5  Following arguments of counsel, the Court took the matter under submission.
6    After deliberation and consideration of the evidence submitted, the
7  Court makes the following findings of fact and conclusions of law pursuant to
8  Federal Rule of Civil Procedure 52.  As discussed below, the Court finds in
9  favor of Defendant.

10                        **FINDINGS OF FACT**

11    1.    Plaintiff Brian Gearhart is a 55 year old veteran of the United
12  States armed services.  Mr. Gearhart brought this action alleging medical
13  malpractice against Defendant United States of America under the Federal
14  Tort Claims Act (28 U.S.C. § 2671, *et seq.*).  Plaintiff alleged that health care
15  providers at the Veterans Affairs San Diego Health Care System ("San Diego
16  VA") negligently performed hernia repair surgery, causing him injury, pain
17  and suffering, and necessitating a colostomy procedure and a surgery to
18  reverse the colostomy.

19    2.    Defendant, the United States of America, is a sovereign entity that
20  provided healthcare services to Plaintiff Gearhart through the San Diego VA,
21  a "federal agency" under 28 U.S.C. § 2671.

22      Prior Medical History

23    3.    In approximately 1981, Mr. Gearhart underwent surgery for the
24  repair of a hiatal hernia.  A hiatal hernia is a protrusion of a part of the
25  stomach through the diaphragm.

26

2

15cv665-MDD

1    4.   In or about 2006, Mr. Gearhart developed a ventral (or incisional)

2  hernia in the area of the earlier incision.  With the ventral hernia, portions of

3  Mr. Gearhart's bowel would protrude through the abdominal wall.  As a result

4  of the ventral hernia, he began experiencing episodes of bowel obstruction

5  that were accompanied by pain, cramping, decreased bowel movements,

6  nausea and vomiting.  He would relieve the obstructions by manually

7  reducing his own hernia.  His obstructions became more frequent over time.

8                 June 26, 2013 Emergency Department Visit

9    5.   On June 26, 2013, Mr. Gearhart first sought treatment at the San

10  Diego VA for symptoms related to his ventral hernia.  He presented at the

11  Emergency Department complaining that he could not reduce the ventral

12  hernia, and that he was experiencing increasing abdominal pain, nausea,

13  vomiting and no bowel movements for 2 days.  (Joint Exhibit "Exh." 1).

14    6.   Inability to reduce an abdominal ventral hernia, along with

15  nausea, vomiting, pain and the loss of the ability to pass gas and have bowel

16  movements are symptoms of bowel obstruction.  Bowel obstruction can occur

17  when the intestine, trapped in a hernia, has a blockage and cannot be reduced

18  or placed back into its normal anatomic position in the abdomen to allow the

19  normal flow of bowel contents.

20    7.   A CT scan showed a high grade bowel obstruction with segments of

21  large and small bowel incarcerated within the hernia.  (Exhs. 1, 2).  The bowel

22  was inflamed and edematous within and around the hernia sac.  (Exhs. 35,

23  36).

24    8.   The Emergency Department physician was able to reduce the

25  incarcerated bowel from the hernia sac with conservative treatment of fluids,

26

15cv665-MDD

ice, and position change.  Mr. Gearhart's symptoms improved and he was sent home that day.

9.     Mr. Gearhart does not contend that there was a breach of the standard of care on June 26, 2013.

<u>July 24, 2013 Admission</u>

10.     On July 24, 2013, Mr. Gearhart returned to the San Diego VA complaining of severe abdominal pain, nausea, vomiting and no bowel movements or passing of gas for 3 days.  (Exh. 3 at 3097).

11.     This time, he was admitted to the hospital, where he remained until July 31, 2013.

12.     On July 26, 2013, a CT scan showed some interval resolution of the small and large bowel dilation depicted in the June 26 CT scan.  (Exh. 4 at 3225).  However, there was now transverse colon and mesenteric fat within the hernia sac and an interval increase in the inflammation within and around the sac.  (*Id.*).

13.     Mr. Gearhart's obstruction was again treated conservatively without surgical intervention, and his symptoms again resolved.  He was discharged on July 31, 2013.  (Exh. 5).

14.     During the hospitalization, Mr. Gearhart was attended by medical staff from the VA General Surgery Department, including staff surgeon and team leader Dr. William Ardill.  Dr. Ardill discussed with Mr. Gearhart a surgery to repair the ventral hernia and prevent the bowel obstructions from recurring.  The surgery was set for August 30, 2013, in order to give Mr. Gearhart a chance to recover and regain his strength before undergoing the surgery.

4

15.   Plaintiff does not contend that there was a breach of the standard of care regarding Mr. Gearhart's treatment during his July 2013 hospitalization.

Mr. Gearhart's Condition Between July 31 and August 30, 2013

16.   Dr. Ardill met with Mr. Gearhart on August 14, 2013, to review the plan for surgery to repair his ventral hernia.  (Exh. 6).  During his meeting with Dr. Ardill, Mr. Gearhart presented no evidence or history of bowel obstruction or incarceration since his discharge from the San Diego VA on July 31, 2013.

17.   Nurse Practitioner Cherie A. Rekevics took a history and performed a physical examination of Mr. Gearhart on August 28, 2013.  (Exh. 7).  Mr. Gearhart reported daily bowel movements and a pain level of 0/10.  (*Id*. at 1864 and 1867).  Mr. Gearhart had normal bowel sounds, a soft as well as non-tender abdomen and a reducible hernia.  (*Id*. at 1868).  During his meeting with Nurse Practitioner Rekevics, Mr. Gearhart had no evidence or history of bowel obstruction or incarceration since his discharge from the San Diego VA on July 31, 2013.  (*Id*.).

Mr. Gearhart's Condition on August 30, 2013 Before the Surgery

18.   The hernia repair surgery was scheduled for August 30, 2013.  Staff Nurse Josephine T. Molo took a history and performed a physical examination on Mr. Gearhart on August 30, 2013.  (Exh. 8).  Mr. Gearhart reported no pain and was found to have a soft abdomen.  During his meeting with Nurse Molo, Mr. Gearhart presented no evidence or history of bowel obstruction or incarceration since his discharge from the San Diego VA on July 31, 2013.  (*Id*.).

5

19.   Dr. Ardill also took a history and performed a physical examination of Mr. Gearhart on August 30, 2013, prior to surgery.  (Exh. 9).  During this examination, Mr. Gearhart presented no evidence or history of bowel obstruction or incarceration since his discharge from the San Diego VA on July 31, 2013.  (*Id.*).

<u>The August 30, 2013 Surgery</u>

20.   As planned, Mr. Gearhart underwent incisional hernia repair at the San Diego VA on August 30, 2013.  Prior to the surgery, no repeat CT scan was performed.

21.   During the August 30, 2013, surgery, which was performed by Dr. Ardill and his team, an incision was made through Mr. Gearhart's skin and deepened through the fascia, exposing the hernia sac, which was then dissected free.  (Exh. 10 at 3251).

22.   The hernia sac is made up of a very thin layer of tissue called the peritoneum, which lines the abdominal cavity.

23.   The peritoneum of the sac was not entered during surgery and the bowel underneath and adjacent to it was not visually inspected.  (Exh. 10).  Instead, the surgeons limited their inspection to a visual and manual palpation of the sac and its contents.

24.   Dr. Ardill testified that the hernia sac is translucent so that its contents can be viewed and that it is so thin that its contents can be determined by manual manipulation.  Dr. Ardill testified that the sac was empty except for a small nubbin of fat tissue.  (*See also*, Exh. 10 at 3251).  Dr. Ardill explained that fat in a hernia sac feels different than bowel in a hernia sac.

25.   Since the hernia sac contained no bowel and the hernia sac was reducible, they elected to return the hernia sac as is through the fascia, repair the defect with mesh, and then close the wound.  (*Id*.).

26.   Dr. Ardill testified that he chose a mesh graft that would optimize the strength of the repair of Mr. Gearhart's hernia in order to reduce the risk of a recurrent incisional hernia, particularly given Mr. Gearhart's size, weight and the mechanical failure of his prior surgical incision.

27.   The ULTRAPRO hernia mesh system Dr. Ardill selected is made up of two layers of synthetic mesh connected by a small mesh cylinder so that the abdominal muscles are sandwiched in between its two layers, providing additional protection against the mesh migrating away from the hernia site.

28.   Dr. Ardill testified he chose the ULTRAPRO mesh system because it is a synthetic mesh that maximizes the strength of the hernia repair by invoking a high inflammatory response on the tissue it contacts to cause those tissues to grow into the interstices of the mesh.  Because of the body's strong inflammatory response to the synthetic mesh, Dr. Ardill was only able to use the ULTRAPRO mesh on the external layer of the hernia sac, not internally where it would have direct contact with bowel.  Placing synthetic mesh directly on the bowel markedly increases the chances for the bowel to adhere (or scar) to the mesh, which in turn can cause bowel obstruction.  Dr. Ardill chose not to enter the hernia sac in part so that he could use the ULTRAPRO mesh that Dr. Ardill felt maximized the strength of the hernia repair.

29.   If Dr. Ardill had entered the hernia sac, he could have used another type of mesh that can be placed directly next to the bowel.  These other types of mesh can be placed in contact with bowel because they do not

provoke a strong inflammatory response, but for the same reason, they do not encourage tissue ingrowth and are not as strong.

30.    After selecting the mesh, Dr. Ardill used his finger to free the external surface of the hernia sac of any adhesions for a distance circumferentially of approximately 3 centimeters.  (Exh. 10 at 3251).  He did this to provide enough room to place the mesh on the outside of the hernia sac.  The incisional site was then closed.  No complications were noted during the surgery.

31.    Mr. Gearhart was discharged from the hospital the next day.

32.    Within 2 days of discharge, Mr. Gearhart became acutely ill.  He returned to the San Diego VA on September 2, 2013, complaining of abdominal pain, fever, and a wound infection with a feculent discharge.  The responding medical providers decided to take him to the operating room for exploratory surgery.  During the surgery, the wound was opened and the mesh was removed.  A colotomy (hole) was observed in a segment of Mr. Gearhart's colon.  The hole in the colon was adhered to the underside of the peritoneum at the two o-clock position away from the midline of the August 30, 2013, surgical site.  (Exh. 13 at 3245).  The colon was leaking stool into the mesh and into the abdominal area previously occupied by the hernia sac.  The spillage had not gone into the intraperitoneal cavity, which was noted to be "clean." (*Id.*).

33.    During the exploratory surgery, Mr. Gearhart's transverse colon was observed to be "very inflamed and edematous, likely from chronic changes due to involvement with his prior hernia."  (Exh. 13 at 3246).  Because of the condition of the colon and the contamination, the attending physician decided

1   to resect the unhealthy portion of bowel and to perform a colostomy.  A mucus
2   fistula was created and the remaining colon was rerouted and reconnected.

3       34.   Portions of Mr. Gearhart's colon and pericolic connective tissue
4   were submitted to the San Diego VA Pathology Lab for evaluation.  The
5   mucosal surface of the colon displayed ischemic and atrophic change, but no
6   obvious mass or necrosis.  (Exh. 14 at 922).  The serosal surface of the colon
7   and the attached pericolic connective tissue showed extensive ischemic and
8   atrophic changes.  The serosal surface and pericolic connective tissue also
9   showed extensive fibrotic and adhesive changes with focal hemorrhage and
10  necrosis.  The largest of the cysts found in the connective tissue was 9 cm in
11  diameter (about the size of a baseball), with a wall measuring 1.2 cm in
12  thickness that displayed severe fibrotic and necrotic changes.  (*Id*.).

13      35.   Mr. Gearhart was discharged from the surgical department on
14  September 10, 2013, and transferred to a skilled nursing facility at the San
15  Diego VA for wound care, colostomy teaching, and rehabilitation.

16               Mr. Gearhart's Recovery

17      36.   Mr. Gearhart's wound healing was slow and on January 3, 2014,
18  he underwent a surgery to place skin grafts on portions of his abdomen.  (Exh.
19  30).  He did not respond well to the surgery and only about 20% of the grafts
20  "took."

21      37.   Mr. Gearhart's co-morbidities, including his smoking and obesity,
22  were partially responsible for his delayed healing.  While at the skilled
23  nursing facility, notwithstanding repeated counseling to discontinue smoking
24  cigarettes so as not to further delay wound healing, Mr. Gearhart continued to
25  smoke.  Mr. Gearhart admitted that he did not care about trying to stop
26  smoking at that time.

9

38.    Mr. Gearhart was discharged from the skilled nursing facility on January 24, 2014, and he returned home.  He continued to have wound healing issues.  He also had a difficult time adjusting to life with the colostomy.  He was embarrassed by the odor the bag would emit and uncomfortable in social situations.  His spouse did not wish to be intimate with him because of his colostomy.

39.    On August 11, 2014, Dr. Ardill performed Mr. Gearhart's "take down" surgery for the reversal of his colostomy.  There were no complications. He tolerated the procedure well and he was discharged from the hospital on August 22, 2014.

40.    Mr. Gearhart testified that the wound has not completely healed. A small hole in the incision, about one inch deep, remains open, for which he is receiving care from the San Diego VA.

41.    Mr. Gearhart does not contend that there was a breach of the standard of care regarding his treatment during recovery or the colostomy take down surgery.

<u>Plaintiff's Claimed Damages</u>

42.    Mr. Gearhart's medical expenses have been covered in their entirety by the VA.  He expects to continue to receive medical care and treatment through the VA and will likely incur no future medical expenses associated with his injuries.

43.    At the time of the surgery on August 30, 2013, Mr. Gearhart was employed as a telephone interviewer for Luth Research.  He was working full time and earning $9.00 per hour.  As a result of his lengthy hospitalizations and periods of convalescence, Mr. Gearhart missed approximately 10 months of work and incurred a total wage loss of $10,000 before returning to his

employment.  Though Defendant disputes liability, Defendant does not dispute the *amount* of wage loss if liable were established.

44.   Mr. Gearhart has suffered physical discomfort, emotional distress, disfigurement, loss of activities, loss of enjoyment of life, and other similar injuries. He will likely suffer similarly in the future, given the still-open wound and the emergence of 3 new ventral hernias.

<u>Plaintiff's Expert: Dr. Leo J. Murphy, M.D., F.A.C.S.</u>

45.   Dr. Murphy, Plaintiff's expert, is a board-certified surgeon at Scripps Mercy Hospital in San Diego, California.  Dr. Murphy is also a Fellow of the American College of Surgeons.

46.   Dr. Murphy believes that the colotomy was caused by abrasive contact between the mesh inserted during surgery and a preexisting adhesion that should have been removed during the surgery.  According to Dr. Murphy, normal bowel movement led to friction between the mesh and the preexisting adhesion, causing a tear.

47.   Plaintiff alleged, through his expert witness Dr. Murphy, that Dr. Ardill breached the standard of care as follows:

> a. Dr. Ardill did not order a repeat CT scan prior to Mr. Gearhart's August 30, 2013, surgery to evaluate his bowel.  Alternatively, Plaintiff's expert testified that a repeat CT scan was not necessary if Dr. Ardill entered and explored Mr. Gearhart's hernia sac at the time of the surgery; and,
>
> b. Dr. Ardill did not enter the hernia sac, did not inspect the bowel, and did not remove adhesions on the bowel or the internal portion of the hernia sac.

15cv665-MDD

48.   Dr. Murphy testified it was essential to obtain a repeat CT scan if it was Dr. Ardill's intention to not enter the hernia sac and inspect the bowel during the surgery.  Dr. Murphy testified that the serial CT scans of June 26 and July 26, 2013, showed increasing inflammation and edema both in and around the hernia sac with evidence of bowel wall fibrosis and adhesions (from the prior surgery and multiple incarcerations and obstructions), including a section of bowel that was likely adhered to the peritoneum immediately adjacent to the hernia sac.

49.   According to Dr. Murphy, the fibrocystic lesions (noted in the pathology report) were likely the result of severe inflammation throughout the bowel and surrounding mesentery.  Further, they likely developed after the CT scan on July 26, 2013 (they were not visible on the July 26 radiograph) and the surgery on August 30, 2013 (the pathology report notes the inflammation and lesions were chronic suggesting it preexisted the August 30, 2013 surgery).   Dr. Murphy testified they were likely a continuation of the inflammatory process observed on the serial CT scans.

50.   Dr. Murphy testified it was below the standard of care when Dr. Ardill and his team failed to enter the hernia sac and failed to visually inspect the bowel and surrounding tissues during the surgery on August 30, 2013.  By not doing so, they failed to take into appropriate consideration that Mr. Gearhart's bowel had recently undergone marked inflammatory and edematous changes and likely had dense fibrotic adhesions within the hernia sac and in the immediate proximity to it as well – all of which needed to be addressed during the hernia repair surgery.

51.   Dr. Murphy further testified that the failure to enter the hernia sac and inspect the surrounding bowel led directly to the injury that

necessitated the colostomy on September 2, 2013.  Had the bowel been properly inspected, Dr. Murphy would have expected the surgeons to address any unhealthy portion before repairing the ventral hernia.  That portion of bowel would then be cleared of any adhesions and fibrotic lesions.  If it then appeared healthy, no further care would be required and the hernia would then be repaired.  If it did not appear healthy, any non-viable bowel would be resected and the remaining bowel then reattached before completing the hernia repair.  Dr. Murphy would not have expected a colostomy (and later a colostomy "take down") to be necessary if this had been done.

52.    On cross-examination, Dr. Murphy conceded that handling the bowel can cause adhesions, and that a colotomy is a known complication of hernia repair surgery.

53.    Dr. Murphy opined that the primary reason for Mr. Gearhart's long recovery was the fecal infection of the fascia, skin and fat caused by the hole in the colon that he attributes to Defendant's conduct.  Dr. Murphy acknowledged that Mr. Gearhart's weight and smoking contributed to the delayed recovery, but opined they were not the primary cause.

54.    Dr. Murphy testified that Mr. Gearhart will likely have future recurrence of hernias and bowel obstructions.  Given the multiple abdominal surgeries he has now undergone, the contamination of his abdomen following the colotomy, and the fact that he has already developed 3 new ventral hernias since the events at issue, Dr. Murphy believes there is an 80% chance that Mr. Gearhart will require future care for his ventral hernias and bowel obstructions.  Dr. Murphy opined that if the bowel adhesions had been appropriately addressed at the time of the original surgery, the likelihood of future complications would have been in the range of 20%.

13

## Defendant's Expert: Dr. Sunil Bhoyrul, M.D., F.A.C.S, F.R.C.S

55.    Dr. Bhoyrul is a board-certified surgeon serving as the Section Chief, General Surgery, Medical Director, Bariatric Surgery at Scripps Memorial Hospital in La Jolla, California.  Dr. Bhoyrul is also a Fellow of the American College of Surgeons and of the Royal College of Surgeons of England.

56.    Dr. Bhoyrul testified that the care provided by Dr. Ardill met or exceeded the standard of care.

57.    According to Dr. Bhoyrul, a repeat CT scan was not necessary based on Mr. Gearhart's lack of symptoms following his July discharge, and was not necessary because the information the CT scan could have provided would not have changed the "management algorithm."  He explained that, rather than rely on a CT scan, which does not display conditions in full detail, surgeons make decisions about whether to enter the hernia sac and perform more invasive procedures based on real-time observations of the patient's condition during the course of surgery.

58.    Dr. Bhoyrul further testified that the standard of care did not require the surgeons to enter the hernia sac, inspect Mr. Gearhart's bowel, or remove all of the adhesions between the bowel and peritoneum.  Despite the complication that occurred in this case, it was his opinion that, at the time of the repair surgery, the risks associated with entering the sac outweighed the benefits of doings so.

59.    Dr. Bhoyrul explained that surgeons can see through the peritoneum that forms the hernia sac, and that surgeons can palpate the contents of the bowel.  Based on these observations, board-certified surgeons can readily distinguish between bowel, fat, and other contents.

60.     Dr. Bhoyrul testified that Dr. Ardill properly palpated the hernia sac, discerned that no bowel was in the hernia sac, and properly chose not to enter the hernia sac.  According to Dr. Bhoyrul, there were no indications supporting opening the hernia sac, but there were many risks to opening the hernia sac.  A surgeon entering the hernia sac can accidentally cut the bowel, can expose the bowel to an additional risk of infection or inflammation, and can cause adhesions.  In addition, the best meshes cause the most inflammatory response in the patient's tissues, because the inflammatory cells become collagen, which strengthens the repair site, thus avoiding failure of the hernia repair.  These meshes cannot be used if the hernia sac is entered, because of the high risks associated with invoking an inflammatory response in the bowel tissue.  Consequently, if the hernia sac is entered, the surgeon must use a less effective mesh, reducing the likelihood of a successful hernia repair.

61.     Dr. Bhoyrul testified that the decision to open the hernia sac is a case-by-case decision made by the surgeon during the surgery based on individual circumstances.

62.     He further opined that the standard of care did not require Dr. Ardill to remove all adhesions between the bowel and the peritoneum; instead, a circular "finger sweep" to remove adhesions from the area where the mesh will be placed is sufficient.  He explained that sweeping further to remove adhesions introduces the risk the surgeon will violate the peritoneum or cause other holes or bleeding.

63.     Dr. Bhoyrul confirmed that a colotomy is a known complication of hernia repair surgery.

15cv665-MDD

64.     Dr. Bhoyrul opined that Mr. Gearhart's recovery was not prolonged for the type of complication he had (spillage of bowel contents in wound site) and for Mr. Gearhart's weight and smoking risk factors.

65.     He further opined that the colotomy could have developed from an adhesion to the peritoneum that developed *after* the repair surgery or after the hole formed.  The proximity of the hole in the colon and the adhesion to the peritoneum is a mere correlation; it does not show causation.

## CONCLUSIONS OF LAW

66.     Jurisdiction in this matter is based on 28 U.S.C. §§ 1346(b) and 2671.

67.     The Department of Veterans Affairs is a "federal agency" under 28 U.S.C. § 2671, which at all times operated the San Diego VA.

68.     The acts and/or omissions challenged by Mr. Gearhart were committed by healthcare providers who were agents and/or employees of the San Diego VA, and accordingly, "employees of the government … acting within the scope of [their] office or employment" pursuant to 28 U.S.C. § 2671.

69.     The Federal Tort Claims Act directs the Court to apply the substantive law of California, which is where the alleged negligence occurred. *See* 28 U.S.C. § 1346(b); *Carlson v. Green*, 446 U.S. 14, 23 (1980); *Taylor v. United States*, 821 F.2d 1428, 1432 (9th Cir. 1987).

70.     Under California law, "[n]egligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm. (Rest.2d Torts, § 282.)."  *Flowers v. Torrance Mem'l Hosp. Med. Ctr.*, 8 Cal. 4th 992, 997 (1994) (quotations omitted).  "[O]ne 'is required to exercise the care that a person of ordinary prudence would exercise under the circumstances."  *Id*. (quoting *Polk v. City of Los Angeles*, 26

16

Cal.2d 519, 525 (1945); *and citing Rowland v. Christian*, 69 Cal.2d 108 (1968); Cal. Civ. Code § 1714(a).  "Because application of this principle is inherently situational, the amount of care deemed reasonable in any particular case will vary…." *Id.* (citations omitted).

71.    "[T]he standard for professionals is articulated in terms of exercising 'the knowledge, skill and care ordinarily possessed and employed by members of the profession in good standing ....' (Prosser & Keeton, Torts (5th ed. 1984) The Reasonable Person, § 32, p. 187.)." *Id.* at 998.  "[T]he law 'demands only that a physician or surgeon have the degree of learning and skill ordinarily possessed by practitioners of the medical profession in the same locality and that he [or she] exercise *ordinary care* in applying such learning and skill to the treatment of [the] patient.'"  *Id.* (quoting *Huffman v. Lindquist*, 37 Cal. 2d 465, 473 (1951)) (italics and brackets in original).

72.    Under California law, "[a] [medical practitioner] is not necessarily negligent just because [his/her] efforts are unsuccessful or [he/she] makes an error that was reasonable under the circumstances.  [A] [medical practitioner] is negligent only if [he/she] was not as skillful, knowledgeable, or careful as other reasonable [medical practitioners in the same specialty] would have been in similar circumstances."  CACI 505; *see, e.g., Sanders v. Palomar Med. Ctr.*, No. 10cv514-MMA, 2010 WL 2635627, at *6 (S.D. Cal. June 30, 2010) ("The fact that a patient does not make a complete recovery raises no presumption of the absence of proper skill and attention upon the part of the attending physician." (quotation omitted)).

73.    "A difference of medical opinion concerning the desirability of one particular medical procedure over another does not… establish that the determination to use one of the procedures was negligent." *Clemens v.*

*Regents*, 8 Cal. App. 3d 1, 13 (1970); *see also* CACI 506 ("A [medical practitioner] is not necessarily negligent just because [he/she] chooses one medically accepted method of treatment or diagnosis and it turns out that another medically accepted method would have been a better choice.").

74.    The trier of fact must determine whether conduct fell below the standard of care based on the circumstances known to the provider at the time of the event rather than reviewing the events in hindsight.  *See Vandi v. Permanente Med. Grp., Inc.*, 7 Cal. App. 4th 1064, 1070 (1992) ("At the time of treatment there may be dozens, perhaps even hundreds, of diagnostic procedures which could reveal a rare and unforeseen medical condition but which are not medically indicated.").

75.    Plaintiff has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the elements of a negligence claim against Defendant.  The elements of a cause of action for medical negligence are: that defendant was negligent, that plaintiff was harmed, and that defendant's negligence was a substantial factor in causing plaintiff's harm. CACI Nos. 400, 430, 500; *Flowers*, 8 Cal. 4th 992 (1994); *Fein v. Permanente Medical Group*, 38 Cal. 3d 137, 152 n.9 (1985); *Uriell v. Regents of the University of California*, 234 Cal. App. 4th 735 (2015) (finding no error when trial judge instructed jury that plaintiff was required to show that professional's breach of the standard of care was a substantial factor in causing harm).

76.    "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." *Uriell*, 234 Cal. App. 4th at 744 (quotation omitted). "Even 'a very minor force' that causes harm is considered a cause in fact of the

18

injury." *Id.* (citation omitted).  However, "a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about the injury is not a substantial factor." *Id.* (quotation omitted).

77.    Based on the evidence presented, the Court finds that Plaintiff did not prove by a preponderance of the evidence that Defendant's conduct fell below the standard of care.

78.    As for Plaintiff's allegation that Dr. Ardill should have ordered a CT scan, the Court finds that the standard of care did not require that a repeat CT scan be performed.  Mr. Gearhart had no evidence of incarceration or bowel obstruction from July 31, 2013 to the date of the surgery.  Plaintiff's expert, Dr. Murphy, testified that the standard of care does not ordinarily require a repeat CT scan for ventral hernia repair when there's no evidence of obstruction.  He further conceded that the VA literature does not require a repeat CT scan before hernia repair surgery.  Although Dr. Murphy opined that the standard of care required a repeat CT scan if the surgeon does not plan to enter the hernia sac, Dr. Bhoyrul disagreed, opining that a repeat CT is not required because the results would not change the surgeon's "management algorithm."

79.    The Court credits Dr. Bhoyrul's testimony over Dr. Murphy's conflicting testimony about whether the standard of care required a repeat CT scan for the following reasons.  First, Dr. Murphy did not point to any reliable medical literature to support his opinion that a repeat CT scan is always necessary if the surgeon does not intend to enter the hernia sac.  Second, Dr. Murphy conceded that a repeat CT scan is not always necessary, and acknowledged that decisions about how to proceed during surgery are made on a case-by-case basis.  Third, a CT  scan would have had limited value,

19

because Dr. Murphy explained that adhesions, which he believed contributed to causing the colotomy, are not visible on CT scans.  Fourth, Dr. Bhoyrul supported his opinion that a repeat CT scan was not necessary with the explanation that the CT scan results, which do not show everything, essentially become outdated or superseded by the surgeon's real-time, first-hand observations during the surgery.  Accordingly, the Court finds that Dr. Bhoyrul's testimony establishes that the standard of care did not require a repeat CT scan in this instance.  Even if the Court did not find Dr. Bhoyrul's testimony more persuasive, Plaintiff has only established that Dr. Murphy and Dr. Bhoyrul have a difference of medical opinion.  Under California law, a mere difference of medical opinion is insufficient evidence to support a finding of negligence.  Dr. Ardill did not breach the standard of care by failing to order a repeat CT scan.

80.    As for Plaintiff's allegation that Dr. Ardill should have entered the hernia sac, palpated the bowel and cleared it of adhesions, the Court finds that Defendant did not breach the standard of care.  The standard of care did not require Dr. Ardill to enter the hernia sac, palpate the bowel, or remove adhesions beyond the site of mesh placement.  Although Dr. Murphy and Dr. Bhoyrul offered contradictory opinions about whether the standard of care required Dr. Ardill to take these steps, the Court credits Dr. Bhoyrul's opinion over Dr. Murphy's opinion for the following reasons.

81.    Dr. Murphy made several concessions that undermine his own opinion.  Dr. Murphy conceded on cross that the standard of care does not *always* require the surgeon to open the hernia sac in a ventral hernia repair if the bowel is not incarcerated.  Although Plaintiff speculated that bowel may have been in the hernia sac, Plaintiff did not present any evidence that the

20

bowel was incarcerated at the time of surgery, and Defendant presented testimony and contemporaneous documents that the bowel was not incarcerated.  Dr. Murphy also conceded that, when the bowel is not incarcerated, the decision to enter the hernia sac during ventral hernia repair surgery requires "an element of surgical judgment."  Dr. Murphy further conceded that he tailors his treatment to each individual patient.  Dr. Murphy further conceded that handling of the bowel in order to palpate and remove adhesions during surgery can itself cause adhesions, and that those adhesions can subsequently lead to bowel obstruction.  Dr. Murphy acknowledged that palpating the hernia sac is one acceptable method for determining if bowel is present in the hernia sac.  Dr. Murphy further acknowledged that the mere occurrence of a complication, such as a colotomy or a colostomy, does not categorically mean the surgeon fell below the standard of care during the hernia repair surgery.  Additionally, Dr. Murphy did not support his opinion with medical literature.

82.    Dr. Bhoyrul's opinion was internally-consistent and was supported by sound reasons.  Dr. Bhoyrul emphasized that each of the steps urged by Plaintiff (entering the hernia sac; palpating the bowel; removing adhesions beyond the mesh placement site) increase the risks, and decrease the likelihood of a successful surgery and recovery.  He supported his characterization of the risk/benefit analysis with an explanation of the risks associated with each step.  The surgeon may accidentally cut the bowel when entering the hernia sac, causing complications.  Entering the hernia sac precludes the use of the most effective mesh (ULTRAPRO), thereby significantly increasing the risks that surgery will fail or that the problem will reoccur.  Palpating the bowel increases the risk of palpation-caused adhesions,

which can lead to new adhesions that can cause bowel obstructions.  While removing adhesions beyond the mesh placement site, the surgeon may accidentally tear the bowel or peritoneum, causing complications.  Dr. Murphy did not contradict any of the risks explained by Dr. Bhoyrul.  Dr. Bhoyrul also explained that a board-certified surgeon is trained and is competent to inspect the contents of the hernia sac by palpating the hernia sac, and that the surgeon can see through the sac and differentiate between fat and bowel because the sac is thin.  Further, Dr. Bhoyrul's opinion that the decision to open the hernia sac is made at the operating table based on individual facts presented during surgery is consistent with Dr. Murphy's concessions that each patient must be treated based on the individual circumstances presented and that the decision to enter the hernia sac during a ventral hernia repair surgery where the bowel is not incarcerated includes "an element of surgical judgment."

83.    The Court further notes that the ULTRAPRO mesh, which, according to the testimony presented in this case, can only be used when the hernia sac is not entered, would not exist or would not be used at all if the standard of care required surgeons to enter the hernia sac in every hernia repair surgery.  The existence of the ULTRAPRO mesh is consistent with Dr. Murphy's concession that entry of the hernia sac is not categorically required in a hernia repair surgery when the bowel is not incarcerated.

84.    In sum, Plaintiff's expert conceded that the standard of care does not necessarily require a surgeon to enter the hernia sac if the bowel is not incarcerated, and that such decisions are best made by the surgeon based on their observations.  Plaintiff has presented speculation but no evidence to establish that bowel was incarcerated in the hernia sac at the time of the

15cv665-MDD

surgery.  Defendant has presented credible, consistent evidence that the hernia sac did not contain bowel at the time of surgery.  Defendant's expert also explained how each of the steps Plaintiff contends Dr. Ardill should have taken would have increased the risks of the surgery to Mr. Gearhart. Plaintiff's expert conceded one of the risks explained by Dr. Bhoyrul, and did not rebut the others.

85.    The Court finds that, based on the evidence, the colotomy was an unfortunate consequence of the hernia repair.  Defendant's conduct did not fall below the standard of care and did not cause the colotomy.  Defendant is not liable.

## CONCLUSION

**IT IS HEREBY ORDERED** that the Clerk of Court shall enter judgment in favor of Defendant and against Plaintiff as to all claims in the complaint.

**IT IS SO ORDERED.**

Dated:   June 14, 2016

Hon. Mitchell D. Dembin
United States Magistrate Judge